UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11476-RGS

PAUL A. GARGANO and
SHEILA GARGANO

v.

VIGILANT INSURANCE CO.

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

August 4, 2011

STEARNS, D.J.

Plaintiffs Paul and Sheila Gargano brought this declaratory judgment action against defendant Vigilant Insurance Company (Vigilant) after the insurer rejected a claim involving the deterioration of the exterior paint of the Garganos' summer home in Barnstable, Massachusetts. Vigilant based its denial on two exclusions in the homeowners policy (Policy) that it had issued to the Garganos. In Count I of the Second Amended Complaint, the Garganos ask that the court declare that neither of the specified exclusions applies to "delamination of stain from the [home's] shingles." In Count II (violation of Mass. Gen. Laws ch. 176D, § 3(9)), and Count III (violation of Mass. Gen. Laws ch. 93A, § 11) of the Second Amended Complaint, the Garganos assert unfair and deceptive claims handling by Vigilant.

After the six months of formal discovery authorized by Judge Saris,[1] Vigilant brought this motion for summary judgment contending that the request for declaratory judgment is defeated by the unambiguous terms and conditions of the Policy; that Mass. Gen. Laws ch. 176D, § 3(9) does not authorize a private right of action; and that the Garganos are not proper plaintiffs under Mass. Gen. Laws ch. 93A, § 11.

## BACKGROUND

The uncontroverted facts supporting Vigilant's motion for summary judgment are as follows.[2] In 1995, the Garganos built a summer home on the south shore of Cape Cod in Barnstable (the Property). Vigilant issued a homeowners policy insuring the house and garage on the Property ("Masterpiece" Policy No. 11510734-04).[3] During the relevant time period – from August 1, 2007, to August 1, 2009 – the Policy contained the following exclusions.

> **Gradual or sudden loss**. We do not provide coverage for the presence of wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping, however caused, or any loss caused by wear and tear, gradual deterioration, rust, bacteria, corrosion, dry or wet rot, or warping.

---

[1] This case was transferred to this session by Judge Saris on February 28, 2011.

[2] Pursuant to Local Rule 56.1, Vigilant's Statement of Facts in Support of Summary Judgment (SOF) is deemed admitted as the Garganos did not file a contravening statement of facts.

[3] The Garganos have maintained their homeowners policy with Vigilant for some fifteen years.

We also do not cover any loss caused by inherent vice, latent defect or mechanical breakdown. But we do insure ensuing covered loss unless another exclusion applies.

**Faulty planning, construction or maintenance**. We do not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance. It does not matter whether the faulty acts, errors or omissions take place on or off the insured property. But we do insure ensuing covered loss unless another exclusion applies. "Planning" includes zoning, placing, surveying, designing, compacting, setting specifications, developing property and establishing building codes or construction standards. "Construction" includes materials, workmanship, and parts or equipment used for construction or repair.

Def. Ex. 5 at 0111-12 and Ex. 6 at 0039-41.

In June of 2006, Ronald Dooley, the owner of R&L Painting and Carpentry (R&L), began applying a Zinsser alkyd primer and a Benjamin Moore stain to the shingles of the house and garage. Dooley had stained the shingles in 2002 with "a primer and two coats of a solid body stain." Def. SOF ¶ 43. Dooley "typically expects five to seven years of quality performance from coatings applied on residential properties on Cape Cod."[4] Def. Ex. 4 at 216. Dooley completed the paint job at the end of September of 2006.

Approximately one to two years later, the Garganos noticed that the "coating

---

[4] Dooley has worked as a professional house painter for over twenty-five years.

was starting to peel off the shingles."[5]  Def. Ex. 3 at 182.  In June of 2009, Paul Gargano reported the problem to Kevin McDonald of Chubb and Son, Vigilant's representative.  Chubb employee James Rogers was assigned to investigate the Garganos' claim.  On June 26, 2009, Rogers and David Grandpre, P.E., of CA Pretzer Associates, inspected the Property.  Rogers forwarded Paul Gargano a list of questions from Grandpre to "assist Grandpre in determining what is causing paint to peel off from the shingles."  Def. Ex. 9.  In response, Gargano told Rogers and Grandpre that the shingles had been "stained as needed approximately every two years"; that the shingles were stained in the Summer of 2008 (rather than 2006); that "no 'prep' work" was performed prior to the staining of the shingles; and that "the stain first began to peel in April of 2008."  *See* Def. Ex. 1 at 43-47, 94-96; Def. Ex. 10.

Later, in an October 20, 2009 email, Paul Gargano stated that "[t]he deterioration occurred within one year of the proper application." Gargano testified at his deposition as follows:

> Q.      Okay.  Now you say [referring to October 20, 2009 Email marked Deposition Exhibit 13], "The deterioration occurred within one year of the proper application." By "the proper application" here you're talking about 2006, that application?

---

[5] The Garganos' testimony regarding the approximate date when they first noticed the peeling has ranged from seven months to nineteen months after the completion of the 2006 painting job.

A.    Yes.

Q.    And you're saying the deterioration occurred within one year of that application?

A.    Right.

Q.    So that would be the summer of 2007?

A.    That would be sometime around 2007 when it was starting to deteriorate, because I had mentioned I became aware of it in 2008 because then it started to show more than just a minor blemish.

Q.    You say that the deterioration occurred within a year of the proper application. So that would be September of '07?

A.    Right.

Q.    And that's when there was minor blemishing?

A.    That's when there was an indication that it didn't look as it should look.

Q.    Okay. But it wasn't until April of 2008 that it began to have a real problem?

A.    As I said here, it was sometime following February, March, April, in that area there.

Q.    All right.

A.    It started to show a delamination. It was more than a blemish. Now the paint is starting to separate from the shingles.

Q.    That's what you described as blight, meaning here and there –

A.      Yes. Yes.

Q.      And then sometime a little later you said May or June it began to come off in sheets.

A.      May or June of 2009.

Q.      '08?

A.      In May or June of 2008 it just increased. It started to delaminate in sheets during the time I filed a notice of claim, and I believe that was in 2009.

Def. Ex. 1 at 94-96.

In her Answers to Interrogatories, Sheila Gargano stated that the delamination began approximately one year after the 2006 application of the stain. Def. Ex. 4. At her deposition, she testified that the peeling began a year and a half later, but subsequently confessed to uncertainty as to the exact time. *Id*. Sheila Gargano described the delamination as follows.

Q.      When you first noticed, whenever that was, the beginnings of the delamination of the stain from the shingles, can you describe for me what you saw and where you saw it?

A.      I think it started by that back door into the courtyard. Why there? I don't know, because it's more or less protected, but it started with bubbles. That's how it started. Then the bubble would either break or somebody would touch it, and there you go. Then it started in different places, but that area was the first area I remember.

Q.      Where did you see it next?

A. I would say then we would have to go around the corner, going out toward the ocean, near that corner up high. The wind from that area is I think from the north. I'm not sure. That was the next area.

Q. What did you see there? More bubbling? Was it bigger?

A. It was more or less just flaking off. It's up high. It just started to flake.

Q. At some point did you see the sheets of stuff coming off?

A. It was flying around. Sure, it's windy.

Q. Big sheets?

A. The size of the shingle, sure.

Q. Flying around?

A. Definitely.

Q. Did any of the shingles come off?

A. No.

Q. Your husband had mentioned that the paint could kind of curl up from the shingles?

A. Yes.

Q. You saw that?

A. Yes.

Q. Did any of the shingles curl?

A.    No.

Q.    What does it look like today, the house, the exterior?

A.    When you look at it, it just looks spotty. Some areas have a whole
      area as big as this wall with nothing, and then over here and there
      will be some, and here it will be all covered.

Def. Ex. 2 at 25-26.

In a letter dated July 9, 2009, Rogers informed the Garganos that Vigilant was continuing its investigation of their claim under a reservation of rights.   On July 22, 2009, Grandpre issued his initial report (Def. Ex. 12).[6]  In the report, Grandpre stated that "the coating had failed on shingles located on all sides of the house."[7]  He found that the south-facing and higher elevations of the house were the most severely damaged because of the "increased exposure to the weather that has caused the unbonded coatings to peel off." *Id*.  Grandpre indicated that he had observed numerous "micro cracks" within the failed coating as well as "large gaps at cracks in the coating." *Id*.   Grandpre found a high moisture content in the shingles on all sides of the Garganos' house.   (Grandpre stated that the moisture content ranged from 24.4 to

_____

[6] On July 23, 2009, Rogers sent an email to the Garganos attaching Grandpre's report.

[7] Grandpre used the term "coating" to describe the "application of protective material that has been applied to the wood shingles."  *Id*.

55.1%).[8] Grandpre concluded that the stain "failed" because of "improper preparation of the shingles and application of the coating." *Id*. at 4.

Grandpre provided a supplemental report on August 21, 2009, after receiving the results of a "coating sample analysis" performed by Sherwin Williams Paint Company. The analysis stated that

> [t]he chips were examined using an optical microscope. The adhesion loss is occurring between the substrate surface and the first coat applied. The wood profile, wood fibers, and mold/mildew found on the back of the chips indicate that the peeling was due to successive moisture from within the substrate. The paint chips measure 11 mils in dry film thickness.

Def. Ex. 15.

Based on the Sherman Williams' analysis and interviews with Dooley, as well as photos provided by Paul Gargano, Grandpre concluded as follows.

> From the date of construction in 1995 to 2002, the shingles were coated with a semi-transparent stain. The shingles were exposed to sunlight and were weathered. There would have been a breakdown of the surface of the wood fibers over those seven years. The change over to the oil based primer and solid body stain in 2002 was apparently successful until the spring of 2009, following the second application of the three-coat system

---

[8] In their Second Amended Complaint, the Garganos state that their "painter conducted significant tests of the moisture content of the shingles . . . and determined that the moisture content was below 10%." Second Am. Compl. ¶ 9. In their Opposition, they argue that Vigilant's experts are duty-bound to accept this as fact. However, the Garganos fail to offer evidence of the testing either in the form of an authenticated exhibit or Dooley's sworn testimony. While Vigilant served Dooley with a deposition subpoena at his last and usual address, he did not respond. Def. SOF ¶ 68.

applied in 2007. The second application of coatings in 2007 built up the thickness of the system, and the process of the coating protection breakdown progressed to its current condition. The extensive coating failure that occurred all around the house has allowed water from repeated rain events to infiltrate past the coatings to the shingle surface. Due to the fact that the shingles were not pre-dipped and back-primed, rainwater has infiltrated past the surface of the shingles at shingle edges and has been soaked up by the shingles. The six layers of coating applied in 2002 and 2007 helped hold the water in. Water caused the surface of the wood shingles to deteriorate, and the coating failure has escalated to its current condition.

Mr. Dooley's additional background information regarding the history of the coating applications at the Gargano residence included a description of preparation procedures. These procedures included power-sanding and cleaning the surface of the shingles in 2002, prior to applying the coatings. The preparation and coating application performed in 2007 was similar to that performed in 2002. The procedures Mr. Dooley described appear to be sound in practice. However, the fact remains that the large scale coating failure has occurred around the entire house. This is not an occurrence caused by any sudden or accidental external storm events or by any interior water sources. **It remains a problem that is the result of the historic preparations of surfaces prior to coating applications, selection of coating products, maintenance of the exterior coatings and shingles, and weathering from sun, rain, ocean spray, and seasonal variations in temperature**. The summation of the variables affecting the coating performance is that the coating system has dramatically failed and is no longer protecting the wood shingle siding.

It is my engineering opinion that the coating systems and shingles have reached the end of their useful life. The procedures Mr. Dooley performed in 2002 changed the look of the house from a weather-beaten appearance to a solid pigment color look. His efforts were good enough to provide about six years of acceptable coating performance. However, based on the extensive coating failure that has occurred, different preparations, materials, and maintenance would have been required, starting in 2002, when the decision to change the appearance of the

weathered shingles was made, to allow the different coating products to
succeed.

*Id.* (emphasis in original). Vigilant provided the Garganos with copies of Grandpre's

reports on July 23, 2009, and August 25, 2009, respectively.

In response to Grandpre's supplemental report, Paul Gargano sent an email to

Rogers stating that "[b]etween the years [2006] to the present time . . . the condition

as it exists is the result of a product failure caused by the refinishing of the shingles

with the Benjamin Moore stain and Zinsser primer." *See* Def. Ex. 1 at 71; Def. Ex. 16.

On September 3, 2009, Rogers informed the Garganos that there was no coverage

under the Vigilant Policy for the damage to the shingles. Rogers cited the "gradual or

sudden loss" and "faulty planning, construction or maintenance" Policy exclusions, as

well as the two reports prepared by Grandpre as Vigilant's bases for the denial. *See*

Def. Ex. 17. Rogers specified that "[e]ven if this coating was incompatible with the

primer or shingle, the policy covers neither faulty materials nor workmanship and we

cannot pay for the repairs of the dwelling. Loss caused by wear and tear is also

excluded." *Id.*

On September 4, 2009, Paul Gargano responded to Rogers by email informing

him of two other properties where Benjamin Moore primer and the associated stain had

developed premature peeling problems. On October 20, 2009, Gargano followed up

with a "rebuttal" email to Vigilant's denial of coverage, asserting that "[t]he sole conclusion is that there was a product failure" of either the primer or the stain. *See* Def. Ex. 7.

By letter dated November 16, 2009, Rogers notified the Garganos that Vigilant had decided to reopen the claim file and enlist a "coatings specialist" to determine the exact cause of the damage. *See* Def. Ex. 19. On December 7, 2009, Rogers and Richard Granito, the coatings expert, inspected the Property. On February 2, 2010, Rogers forwarded Granito's report to the Garganos, as well as a letter reaffirming Vigilant's denial of coverage. In his report, Granito stated that the painted surfaces of the home's exterior had poor film integrity and that "the shingles are completely saturated with water." Def. Ex. 22 at 7. Granito affirmed that "the maximum content of moisture for any wood is in the area of 20% and any additional moisture will migrate as far as it can (in this case, to the interface of the alkyd primer)." *Id.* Granito opined that the moisture trapped by the alkyd primer had "deteriorate[d] the existing bond [of the coating] and [had] cause[d] significant dimensional instability as the weather changed from warm to cold," resulting in "major grain cracking and delamination." *Id.* Granito stated that the cracking and delamination had in turn allowed for the entry of more surface moisture. Granito noted that such grain cracking and delamination was present "all over" the home. Granito concluded that

[t]he primary cause of the paint failure is the paint system used. An alkyd primer gives a film that does not allow moisture vapor transmission and unless you are able to coat all exposed wood surfaces, moisture will get into the shingles and not be able to pass through. **In time, the moisture content is maximized and a layer of water forms between the wood and the coating, resulting in the paint failure existing on this house.**

*Id.* at 22 (emphasis added).

The Garganos filed this lawsuit against Vigilant in the Barnstable Superior Court on June 24, 2010. Vigilant removed the action to this court on August 30, 2010, and filed for summary judgment on April 15, 2011. Fact discovery closed on April 21, 2011. Plaintiffs' expert designation deadline was May 21, 2011; the Garganos did not identify an expert.[9]

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." *Nat'l Amusements, Inc. v. Town*

---

[9] In an affidavit submitted on May 26, 2011, Paul Gargano stated that it was his intention "to produce a witness who is knowledgeable in contractual documents of insurance." Gargano Aff. ¶ 5. The Garganos had failed to identify this expert.

*of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993).

### Count I - Declaratory Judgment

In Count I, the Garganos ask the court to find that the "gradual or sudden loss" and/or "faulty planning, construction or maintenance" exclusions in their Policy do not apply to their claim. With regard to the "gradual or sudden loss exclusion," the Garganos assert

> [t]hat the newly applied stain was the appropriate and most customary stain to be used based on the materials and location of Plaintiffs' residence; [t]hat the delamination of the newly applied stain was not "wear and tear" or "[g]radual deterioration," but occurred relatively quickly after application of the newly applied stain and continues to delaminate; [and] [t]hat the rapid deterioration of the newly applied stain was not caused by faulty materials or workmanship.

Second Am. Compl. ¶ 30. The Garganos maintain that neither of Vigilant's experts address "whether the deterioration was gradual, making a conclusion only regarding the source of the deterioration . . . ." Opp'n Mem. at 7. They argue that [i]t is thus not clear whether the deterioration was gradual without further discovery." *Id*. at 8. The Garganos also contend that Vigilant "had a duty to accept the statement given by the painting contractor and make an assessment to perform a more thorough examination of the[ir] residence." *Id*. With regard to the faulty construction exclusion, the

Garganos argue simply that "painting is not construction."

In its review of an insurance policy, the court "must construe the words of the policy according to the fair meaning of the language used, as applied to the subject matter. Moreover, where the words of an insurance contract are 'plain and free from ambiguity they must be construed in their usual and ordinary sense.'" *Jacobs v. U. S. Fid. & Guar. Co.*, 417 Mass. 75, 76-77 (1994). "These tasks of contract interpretation, including the determination of ambiguity or its lack, are matters for the court." *U.S. Aviation Underwriters, Inc. v. Fitchburg-Leominster, Flying Club, Inc.*, 42 F.3d 84, 86 (1st Cir. 1994), quoting *Boston Edison Co. v. F.E.R.C.*, 856 F.2d 361, 365 (1st Cir. 1988) (applying Massachusetts law). Only if the court determines that the insurance contract is ambiguous is the intent of the parties then a question for the finder of fact. *See Browning-Ferris Indus., Inc. v. Casella Waste Mgmt. of Mass., Inc.,* 79 Mass. App. Ct. 300, 307 (2011).

In giving meaning to exclusionary language in an insurance contract, a court is "guided by three fundamental principles: (1) an insurance contract, like other contracts, is to be construed according to the fair and reasonable meaning of its words. . . . (2) exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured, . . . and (3) doubts created by any ambiguous words or provisions are to be resolved against the

insurer." *Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass. App. Ct. 318, 323-324 (1991); *Hanover Ins. Co. v. Ramsey*, 405 Mass. 1101 (1989) (same). "An insured generally bears the burden of proving that a particular claim falls within a policy's coverage, while an insurer has the burden of proving the applicability of a particular exclusion." *French King Realty Inc. v. Interstate Fire & Cas. Co.*, 79 Mass. App. Ct. 653, 660 (2011) (internal citation omitted).

The faulty planning, construction, or maintenance exclusion in the Policy states that it does not cover "faulty acts, errors or omissions of . . . person[s] in construction or maintenance. . . . 'Construction' includes materials, workmanship, and parts or equipment used for construction or repair." Vigilant's experts have provided undisputed testimony that the damage to the shingles occurred because they were not "pre-dipped and back-primed." That failure allowed rainwater to infiltrate the shingles where it became trapped, causing the coating to peel. Grandpre opined that the stain/primer used on the shingles had "failed," while Granito concluded that "[t]he primary cause of the paint failure is the paint system used." *See* Def. Ex. 22.

With respect to the "faulty construction" exclusion, Paul Gargano argued at the motion hearing (although not in the written opposition to summary judgment) that "painting is not construction." The argument, however, reads the words "maintenance"and "repair" entirely out of the express terms of the exclusion. It

16

specifically defines construction to include "materials, workmanship, and parts or equipment used for construction or repair." Def. Ex. 6 at 0039-41. The 2006 priming and staining of the exterior shingles falls within any fair and reasonable meaning of "repair or maintenance" of the Property.[10]

Vigilant also relies on the "gradual loss" exclusion of the Policy. Vigilant points to the expert reports detailing the "breakdown" of the surface of the shingles over the years, and attributes the coating failure, in part, to "weathering from sun, rain, ocean spray, and seasonal variations in temperature." Def. Ex. 15 at 5. The Garganos themselves testified to the progressively more visible signs of the deterioration of the shingling surface from 2006 to June of 2009 (when Paul Gargano reported the delamination problem to Chubb and Sons).[11] In the absence of any contradictory

---

[10] Sheila Gargano listed her payment to Dooley in her check register as "home repair." Paul Gargano testified that the shingles were stained "*as needed* approximately every two years." *See* Def. Ex. 1 at 14-19, 45-46 (emphasis added).

[11] In Paul Gargano's response to Vigilant's Interrogatory No. 22 (signed in December of 2010), he stated that "[t]he deterioration was not rapid in its occurrence, but ongoing." Def. Ex. 3. The Second Amended Complaint similarly alleges that "in fiscal year 2008 and continuing through 2009, the new stain from said dwelling began to rapidly delaminate . . . [and] continues to delaminate." Second Am. Compl. ¶¶ 13, 30(b).

evidence, the court finds that this second Policy exclusion applies as well.[12]

### Count II - Unfair and Deceptive Practices in the Business of Insurance

In Count II, the Garganos claim that Vigilant violated Mass. Gen Laws ch. 176D, § 3(9), by "engag[ing] in a minimal investigation . . . ; fail[ing] to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts for denial of a claim because [Vigilant] only quoted the policy exclusions in part to Plaintiffs, ignored the inclusions of coverage, and did not adequately explain its denial under these exclusions."  Second Am. Compl. ¶¶ 35-36.  However, Mass. Gen. Laws ch. 176D authorizes the enforcement of its provisions by the Massachusetts Commissioner of Insurance – the statute does not authorize the bringing of an action by a private citizen.  *See, e.g., Metro. Prop. & Cas. Ins. Co. v. Boston Reg'l Physical Therapy, Inc.,* 538 F. Supp. 2d 338, 343 (D. Mass. 2008), quoting *Thorpe v. Mut. of Omaha Ins. Co.*, 984 F.2d 541, 544 n.1 (1st Cir. 1993).  *See also Blais v. Hartford Fire Ins. Co.*, 2011 WL 1303135, at *15 n.21 (D. Mass. March 30, 2011); *Ryan v.*

---

[12] The Garganos also assert in a Supplement to their Opposition, "that the ambiguity in the terms of the insurance contract are to such a degree that it is void for vagueness."  Gargano Aff. ¶ 4.  The Garganos propose to offer the testimony of a witness "knowledgeable in contractual documents of insurance" to verify the argument. *Id.* ¶ 6.  The court is not of the view that such expert testimony is necessary.  *See B & T Masonry Const. Co., Inc. v. Public Serv. Mut. Ins. Co.*, 382 F.3d 36, 38 (1st Cir. 2004).

*Fallon Cmty. Health Plan*, 921 F. Supp. 34, 38 (D. Mass. 1996); *Ferrara &*
*DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 173 F.R.D. 7, 14 (D. Mass. 1997). A
private party who has been harmed by an insurer acting in violation of Chapter 176D
may only recover damages pursuant to an action under Mass. Gen. Laws ch. 93A, §
9(1), a cause of action which the Garganos did not plead. *See Cont'l Ins. Co. v.*
*Bahnan*, 216 F.3d 150, 157 (1st Cir. 2000) ("[C]onduct that abridges [ch. 176D] may
or may not abridge [ch. 93A]."); *Brazas Sporting Arms, Inc. v. Am. Empire Surplus*,
220 F.3d 1, 9 (1st Cir. 2000).[13]

### Count III - Unfair and Deceptive Trade Practices

In Count III, the Garganos contend that Vigilant violated Mass. Gen. Laws ch.
93A, § 11, as it "engaged in unfair and deceptive acts or practices in the business of
insurance by being selective in its assessment and assertion with the intent to deny
coverage through its policy." Second Am. Compl. ¶ 38. Section 11 of Chapter 93A,
in contradistinction to section 9, is a business-to-business statute. Liability under the
unfair or deceptive act branch of section 11 "requires that there be a commercial

---

[13] At the motion hearing, the Garganos based the viability of their Chapter 176D
claim on a Rhode Island federal court case, *Robertson Stephens, Inc. v. Chubb Corp.*,
473 F. Supp. 2d 265 (D.R.I. 2007). The case, however, has no bearing on Chapter
176D, rather it discusses the common-law tort of bad faith as it is defined by Rhode
Island law.

transaction between a person engaged in trade or commerce [and] another person engaged in trade or commerce." *Szalla v. Locke*, 421 Mass. 448, 451 (1995). Moreover, "the unfair or deceptive act or practice must occur in the context of a trade or commerce in which the defendant engages with the plaintiff." *The Stop & Shop Supermarket Co. v. Loomer*, 65 Mass. App. Ct. 169, 177 (2005). "[T]he choice between [§ 9 and § 11] appears to turn on whether a given party has undertaken the transaction in question for business reasons, or has engaged in it for purely personal reasons (such as the purchase of an item for personal use)." *Frullo v. Landenberger*, 61 Mass. App. Ct. 814, 821 (2004).

In a strained attempt to squeeze what is clearly a consumer peg into a commercial hole, the Garganos assert that they "engage in the conduct of trade or commerce with their dwelling by occasionally renting out the dwelling to third parties and reserving a portion thereof for services as a contractor, while paying for upkeep of the house and property from the remainder." Second Am. Compl. ¶ 39. They further claim that "[a]s a result of employing [Vigilant's] services, [they] have suffered a loss of enjoyment of their property, which severely impacts the fair market value of the property as a whole." *Id*. ¶ 40.

There is simply no evidence to support the Garganos' contention that their home plays any active role in commerce. Paul Gargano testified that they have never rented

the home to anyone. *See* Ex. 1 at 68-69; Ex. 3. Sheila Gargano similarly testified that they have never rented the home, carriage house or garage, only that a housekeeper, who does not pay rent, lives in a caretaker's apartment. *See* Ex. 4 - S. Gargano Interrog. Answers, Answer No. 15; Ex. 2 - S. Gargano Dep. at 24. The Garganos have failed to offer any evidence that the home facilitates any activity other than providing them with a pleasant place to reside.[14]

ORDER

For the foregoing reasons, the Second Amended Complaint is <u>DISMISSED</u>. The Clerk will enter judgment for Vigilant and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

---

[14] The Garganos presumably brought their claim under section 11 rather than 9 because of their failure to serve Vigilant with a timely demand letter, a prerequisite of bringing a section 9 lawsuit. *See Lingis v. Waisbran*, 75 Mass. App. Ct. 464, 468 (2009). Even had they complied with the section 9 formalities, it is doubtful that the result would be any different. An insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of Mass. Gen. Laws ch. 93A. *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000); *Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 343 (1994); *Gulezian v. Lincoln Ins. Co.*, 399 Mass. 606, 613 (1987). "Chapter 93A requires a level of misconduct over and above a reasonable disagreement about policy language." *Parker v. Worcester Ins. Co.*, 247 F.3d 1, 6 (1st Cir. 2001).

UNITED STATES DISTRICT JUDGE